**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CEDAR RAPIDS DIVISION**

EVE NEEL,

        Plaintiff,

vs.

CRST EXPEDITED, INC.,

        Defendant.

No. C18-98-LTS

**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT WITNESS**

———————————

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................... 2

II.   PROCEDURAL HISTORY .................................................................. 2

III.  SUMMARY JUDGMENT STANDARDS............................................. 3

IV.  RELEVANT FACTS .......................................................................... 6

   A.  CRST's Business Model.............................................................. 6

   B.  CRST's Policies Regarding Sexual Harassment and Retaliation ................... 6

   C.  Michael Anderson's Employment with CRST......................................... 7

   D.  Neel's Employment with CRST......................................................... 9

   E.  Neel's Allegations and CRST's Response............................................. 9

V.   DISCUSSION.................................................................................. 11

   A.  Sexual Harassment – Hostile Work Environment................................... 12

      1.  CRST's Duty to Prevent and Remedy Sexual Harassment ..................... 14

         a.  CRST's Decision to Rehire Anderson ........................................... 16

         b.  CRST's Sexual Harassment Policies and Trainings ............................ 22

   B.  Retaliation .............................................................................. 25

VI.  CONCLUSION ............................................................................... 29

# I.   INTRODUCTION

This case is before me on a motion (Doc. No. 37) for summary judgment and a motion (Doc. No. 40) to exclude expert report and testimony, both filed by defendant CRST Expedited, Inc. (CRST). Plaintiff Eve Neel has filed resistances (Doc. Nos. 41, 42) to both motions and requests oral argument. I find that oral argument is not necessary. *See* Local Rule 7(c).

# II.   PROCEDURAL HISTORY

Neel filed administrative complaints with the United States Equal Employment Opportunity Commission (EEOC) and the Iowa Civil Rights Commission (ICRC) on February 26, 2018, alleging that CRST engaged in sex discrimination. On July 12, 2018, both the EEOC and ICRC issued Right-to-Sue Letters. Neel then filed a complaint (Doc. No. 1) with this court on September 10, 2018, asserting claims of (1) sexual harassment, (2) retaliation and (3) aiding and abetting in discrimination against CRST, Karen Carlson and "other presently unknown defendants." Neel brought her claims under both Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 2000e, et seq.) and the Iowa Civil Rights Act (Iowa Code ch. 216). She invoked the court's federal question jurisdiction pursuant to 28 U.S.C. § 1331, along with supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

Following discovery, but before CRST filed its motion for summary judgment, Neel filed a motion (Doc. No. 36) to amend her complaint. The motion to amend was granted (Doc. No. 38). In her amended complaint (Doc. No. 39), Neel dropped all claims against individual defendants, leaving only the following claims against CRST:

| | |
|---|---|
| Count I | Hostile environment under federal law |
| Count II | Hostile work environment under Iowa law |
| Count III | Aiding and abetting in discrimination and retaliation under Iowa law |
| Count IV | Retaliation under federal law |

## III.    SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case.  Fed. R. Civ. P. 56(a).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "the substantive law will identify which facts are material."  *Id.*  Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not.  *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question."  *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).  Evidence that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial."  *Anderson*, 477 U.S. at 248–49.  The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue."  *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323).  Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there

is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

No unique summary judgment standards apply to employment discrimination cases. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042–43 (8th Cir. 2011) (en banc) (rejecting prior decisions that applied a "discrimination case exception" to the analysis of summary judgment motions). However, as another judge of this court explained, applying summary judgment standards to the motivation-intensive elements present in most employment discrimination cases is not a simple task:

> Employment discrimination and retaliation, except in the rarest cases, are difficult to prove. They are perhaps more difficult to prove today—fifty years after the passage of the EPA, more than forty years after the passage of Title VII and the ADEA, more than twenty years after the passage of the ADA, and nearly two decades after the passage of the FMLA—than during the earlier evolution of these anti-discrimination and anti-retaliation statutes. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent, nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697–98 (7th Cir. 1987). Indeed, the Fifth

4

Circuit Court of Appeals recognized more than thirty-five years ago, that "[a]s patently discriminatory practices become outlawed, those employers bent on pursuing a general policy declared illegal by Congressional mandate will undoubtedly devise more sophisticated methods to perpetuate discrimination among employees." *Rogers v. EEOC*, 454 F.2d 234, 239 (5th Cir. 1971) (later relied on by the Supreme Court in *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986), as one of the principal authorities supporting recognition of a cause of action for hostile environment sexual harassment under Title VII).

My experience suggests the truth of that observation. Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination and retaliation cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true, because the very best workers are seldom employment discrimination and retaliation plaintiffs due to sheer economics: Because the economic costs to the employer for discrimination or retaliation are proportional to the caliber of the employee, discrimination or retaliation against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination and retaliation plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, the EPA, or the FMLA—for whom plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g., id.* On the other hand, it is also relatively easy for disgruntled former employees to claim a protected basis under federal and state anti-discrimination laws as a reason for their discharge when in fact they played no part. This is true even when the former employee and/or their counsel believe they did. This is what makes deciding these issues on a paper record daunting.

*Pick v. City of Remsen*, No. C13-4041, 2014 WL 4258738, at *12 (N.D. Iowa Aug. 27, 2014). While the task can indeed be daunting in an employment discrimination case, "the focus of inquiry at the summary judgment stage 'always remains on the ultimate question of law: whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the plaintiff because of [the protected characteristic].'" *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1018 (8th Cir. 2005) (quoting *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1336–37 (8th Cir. 1996)).

# IV.  RELEVANT FACTS

The following facts are undisputed unless otherwise noted:

## A.  CRST's Business Model

CRST is a long-haul freight transportation company with more than 3,000 drivers at any one time.  See Doc. No. 42-1 at 1.  It operates by teaming two drivers per truck so one driver may rest while the other is driving, thus allowing the truck to continue moving without violating Department of Transportation daily limitations.  *Id.*  The teamed drivers live and work in the tractor cab for extended periods of time.  *Id.* at 2.

When drivers join CRST, they are trained by lead drivers for a designated period of time.  *Id.*  Student drivers are not permitted to operate a truck alone without completing over-the-road training with a lead driver.  *Id.*  The lead driver recommends to the driver manager whether the student should be upgraded to co-driver status.  *Id.*  CRST states these recommendations are non-binding but Neel argues that there is no reason to believe CRST does not accept them.  *Id.*

Once designated as a co-driver, the driver may team up with another driver of his or her choosing.  *Id.* at 3.  All driving teams are supervised by a driver manager located in Cedar Rapids, Iowa.  *Id.*  Drivers and driver managers communicate via phone, email, and CRST's messaging system, "Qualcomm."  *Id.*

## B.  CRST's Policies Regarding Sexual Harassment and Retaliation

CRST has a written policy prohibiting sexual harassment and retaliation in the workplace.  *Id.* at 3.  Neel denies that this policy prevents, or even effectively prohibits, sexual harassment.  *Id.*  The policy is contained in the Handbook and Statement of Policy (Handbook) that is distributed to drivers and home office employees, including driver managers.  *Id.* at 4.  The policy is also covered in a dedicated session at driver orientation when each driver is provided a stand-alone copy of the policy.  *Id.*  Neel argues, however,

that the training, and the harassment policy in general, are ineffective and even counterproductive. *Id.* at 3–7.

The policy states that CRST "prohibits sexual harassment" and states that those who report it "will NOT be subject to ANY form of retaliation." *Id.* at 4. CRST's Code of Business Ethics also addresses sexual harassment by requiring immediate reporting "to the appropriate Supervisor or Human Resources Department [HR]." *Id.* at 5. The Handbook provides that "[i]f any employee believes he or she is being subjected to verbal or physical harassment, the employee should immediately contact his or her Driver Manager or [HR] to inform them of the situation and to request a new lead driver." *Id.* at 5. It further provides that "[a]n employee has the right to request a new driver without fear of retaliation. Any employee who reports any act of harassment and/or discrimination will NOT be subject to ANY form of retaliation." *Id.* All drivers sign an acknowledgement that they have received and reviewed the Handbook, including the policies against sexual harassment and retaliation. *Id.* at 6. Drivers must also certify their understanding that employees who complain about harassment will be removed from the harassing situation. The acknowledgment states:

> I also understand and agree that if I believe I am being subjected to harassment or discrimination, no matter how severe or pervasive, I will immediately report it to my fleet manager or to the Human Resources Department directly so that I may be removed from the harassing situation and so CRST may conduct a prompt investigation.

*Id.*


## C.    *Michael Anderson's Employment with CRST*

Michael Anderson had three periods of employment with CRST: (1) April 30, 2014, to July 21, 2014, (2) October 8, 2015, to September 26, 2016, and (3) beginning July 27, 2017. *Id.* at 8. During Anderson's second period of employment with CRST, his driver manager, Toby Campanelli, considered him to be very unreliable. Doc. No. 47 at 9. Campanelli states in an affidavit that other drivers told him that Anderson's

issues were related to a "very severe drinking problem" and that Anderson "was not fit to return to driving." *Id.*[1]

CRST's hiring guidelines state that an applicant is not eligible to be hired, unless approved by senior safety management, if they have had more than three jobs in the previous year or more than six jobs in the last three years. *Id.* at 3. The guidelines also provide that "[a]pplicants cannot have already had two non-consecutive prior employment periods with CRST." *Id.* CRST admits that Anderson failed these requirements at the time he was rehired in July 2017. *Id.*

Prior to August 2019, CRST did not perform a criminal history check on potential drivers unless an applicant disclosed a criminal conviction in his or her application. Doc. No. 47 at 2. Certain criminal convictions would disqualify an applicant from employment with CRST. *Id.* at 4. Anderson's criminal history contained an arrest for domestic abuse causing bodily harm, but no convictions. *Id.* at 3; Doc. No. 42-1 at 9.

Anderson was certified to be a lead driver shortly after he was rehired in July 2017. Doc. No. 47 at 10. To qualify as a lead driver, a driver was required to have six months of driving experience and no disqualifying accidents or driving citations. *Id.* at 4. At the time Anderson was rehired, CRST promoted drivers to be lead drivers without conducting additional reference checks with past co-drivers or criminal history checks. Doc. No. 47 at 4–5. Thus, CRST did not consider a potential lead's criminal history, employment history or prior behavior as a CRST employee in determining whether the lead should be paired with a female student driver. *Id.* at 5. Lead drivers did, however, receive additional training on sexual harassment and creating a positive work environment. *Id.* During a prior term of employment, Anderson trained one female driver, who did not report any complaints about him. Doc. No. 42-1 at 8.

---

[1] CRST acknowledges Campanelli's statements in his affidavit but raises questions about the ultimate admissibility of evidence regarding what other people told Campanelli. *Id.*

*D.* *Neel's Employment with CRST*

Neel began working for CRST on July 25, 2017. Doc. No. 42-1 at 7. She acknowledges that she signed CRST's sexual harassment policy and viewed its "positive work environment" training – which included a video about sexual harassment and retaliation. *Id.* After her orientation, Neel spoke with Anderson about being her lead driver and he agreed. *Id.* at 8.

*E.* *Neel's Allegations and CRST's Response*

Neel and Anderson began their first trip together on July 29, 2017, travelling from Iowa to California. *Id.* at 9. Upon beginning their next trip from California to New York, Neel alleges that she began to smell alcohol on Anderson at times when he was not driving. Doc. No. 47 at 13. She further alleges that Anderson began to have angry outbursts at her and she believed he was intoxicated. *Id.* Neel asserts that she attempted to advise her driver manager about Anderson's drinking over the truck's Qualcomm system, but Anderson prevented her from doing so. *Id.* She asserts that she eventually spoke with an unidentified driver manager about Anderson's alleged drinking and abusive conduct but did not have any concrete evidence of his drinking to warrant CRST's intervention. *Id.* at 14.

Neel alleges that Anderson began to make sexual comments to her, such as discussing the size of her breasts, on their drive from California to New York. *Id.* at 14. She also alleges that Anderson was trying to get her to stay in a hotel room with him while they stayed in New York. *Id.* She had her husband, who was also a driver for CRST, speak with Anderson about her concerns and allegations. *Id.* at 15. Anderson spoke with Neel's husband, but has repeatedly denied all of her assertions regarding his conduct. *Id.* at 13–14.

On the evening of August 4, 2017, Neel and Anderson stopped at a truck stop near Fishkill, New York, to spend the night. Doc. No. 47 at 15. Neel stayed on the truck while Anderson left with another truck driver who had met up with him at the truck

stop. *Id.* Neel alleges that Anderson became intoxicated, returned to the truck after midnight and sexually assaulted her. Doc. No. 42-1 at 10. Specifically, she contends Anderson tied her to the bed in the truck using the restraining seatbelt and proceeded to forcibly rape her. Doc. No. 47 at 15. Anderson denies that this occurred but, for purpose of its motion for summary judgment, CRST does not contest Neel's allegations. Doc. No. 42-1 at 10 & n.2.

Neel further alleges that Anderson trapped her in the truck for at least a day after the rape. Doc. No. 47 at 15. She attempted to contact CRST by sending text messages to the student driver manager saying that Anderson had been drinking and was abusive, but she did not report the rape. *Id.* The student driver manager did not receive these messages until she returned to work a couple days later. *Id.* Neel alleges that after Anderson saw her try to communicate with CRST, Anderson contacted CRST representatives himself to say that Neel should be removed from his truck and given a new lead driver. *Id.* at 15–16. Neel was then told she would be removed from the truck. *Id.* CRST admits that these conversations occurred but denies that Anderson contacted CRST only after seeing Neel try to contact supervisors. *Id.* Neel has not had any type of interaction with Anderson since that time. Doc. No. 42-1 at 11.

Neel was removed from Anderson's truck and was placed in a hotel, at CRST's expense, to await a new lead driver. *Id.* During this time, she spoke with investigators at CRST about her allegations regarding Anderson's drinking and sexual harassment, but she did not allege that he raped her. Doc. No. 47 at 16–17. She met up with a new lead driver a few days later, who observed that Neel was experiencing great emotional distress. *Id.* at 17. Neel told the driver that she had been raped and the driver believed that she should be reunited with her husband. *Id.* They drove together until Neel could be reunited with her husband in Arizona. *Id.* at 17. CRST paid for Neel and her husband's return trip to Cedar Rapids, Iowa, where they arrived approximately 8 days after the alleged rape. *Id.*; Doc. No. 42-1 at 11. On August 15, 2017, three days after arriving in Cedar Rapids, and approximately 11 days after the alleged rape, Neel reported

the incident to CRST's investigators for the first time. Doc. No. 42-1 at 12. She stated that she did not report sooner because of the trauma she experienced and her fear of Anderson. Doc. No. 47 at 17.

After completing its investigation, CRST concluded that most of Neel's allegations, including her allegation of rape, could not be corroborated. *Id.* However, Anderson's lead driver certification was revoked and his driving team preference was changed to male only. *Id.* He was also reissued CRST's policies on sexual harassment. *Id.*

Neel is still employed at CRST but has not worked since August 12, 2017. *Id.* She was given layover pay of $100 per day until she began receiving workers' compensation benefits on August 28, 2017. *Id.* Beginning in March 2019, CRST and Neel began a dispute over whether she should continue to receive worker's compensation benefits despite not submitting to CRST's request for an independent medical examination. Doc. No 49 at 46–59. CRST asserted that withholding the benefits pending Neel's submission to the medical exam was appropriate under Iowa law. *Id.* Neel argued that CRST's demands for her to see a doctor so far from home were contrary to the law and a prior ruling in this case. *Id.* Ultimately, Neel was evaluated by an independent medical examiner who opined that she was healthy enough to return to work. *Id.* CRST then officially terminated Neel's benefits. *Id.*

## V.   DISCUSSION

As noted above, Neel asserts claims of hostile work environment sexual harassment, retaliation, and aiding and abetting in discrimination. CRST argues that Neel has not met her burden of showing that it should be held liable for Anderson's alleged acts of sexual harassment. It also argues that Neel has not established a prima facie case of retaliation due to her failure to show that she experienced a materially adverse employment action and that CRST had retaliatory motive. Lastly, CRST argues

that Neel has failed to establish her aiding and abetting claim because she has failed to show that CRST knew of or committed any wrongful act.

In her resistance to CRST's motion for summary judgment, Neel contests only CRST's arguments regarding her sexual harassment and retaliation claims. Thus, I deem Neel to have abandoned her claim for aiding and abetting and will address her remaining claims separately.

## A. Sexual Harassment – Hostile Work Environment

Both Title VII and the ICRA prohibit an employer from discriminating against an employee with respect to her compensation, terms, or conditions of employment on the basis of sex. Sexual harassment is an actionable form of sex discrimination when it is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–67, 73 (1986); *McCown v. St. John's Health System, Inc.*, 349 F.3d 540, 542 (8th Cir. 2003); *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 746–48 (Iowa 2006). As sexual harassment claims brought under the ICRA and Title VII are generally analyzed in the same way, the following analysis applies to Neel's state and federal sexual harassment claims. *See Boyle*, 710 N.W.2d at 746–48.

Courts have recognized various forms of sexual harassment in the workplace as sex discrimination, but an employer's ultimate liability for the harassment depends primarily on who carried out the harassment. *See Vance v. Ball State Univ.*, 570 U.S. 421, 428–31 (2013). When the harasser is a supervisor, the employer may be held vicariously liable for the supervisor's actions in certain circumstances. *Id.* at 428–29. An employer is always vicariously liable "[w]hen [the] supervisor takes a tangible employment action" in the course of harassing an employee, "such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). When a supervisor's harassment does not include a tangible

employment action, a plaintiff must show that the supervisor's actions created a hostile work environment. *Id.* at 429–30. However, an employer may avoid liability in such circumstances if it establishes an affirmative defense, known as the *Ellerth-Faragher* defense, by showing "(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided." *Id.* at 430.

When the harasser is a co-worker, an employer is liable only if it "was negligent with respect to the offensive behavior." *Id.* at 427. Thus, to establish a co-worker hostile work environment claim, a plaintiff must show (1) that the co-worker's actions created a hostile work environment and (2) that the employer's "negligence le[d] to the creation or continuation of [the] hostile work environment." *Id.* at 446. In this context, negligence means that "the employer knew or reasonably should have known about the harassment but failed to take remedial action." *Id.* To fulfill its duty to remedy sexual harassment in the workplace, an employer is obligated to take action that is "reasonably calculated to stop the harassment." *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1125 (8th Cir. 2007) (quoting *Carter v. Chrysler Corp.*, 173 F.3d 693, 702 (8th Cir. 1999)); *Boyle*, 710 N.W.2d at 747.

Anderson was Neel's lead driver at the time of the alleged sexual harassment and rape. Under binding Eighth Circuit case law, Anderson was therefore Neel's co-worker, not a supervisor. *E.E.O.C. v. CRST Van Expedited, Inc.*, 679 F.3d 657, 684 (8th Cir. 2012) ("CRST's Lead Driver is not a supervisory employee."); *see also Vance*, 570 U.S. at 450 ("[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim."). Accordingly, to establish her hostile work environment claim, Neel must show:

> (1) that she is a member of a protected group; (2) that she was the subject of unwelcome sexual harassment; (3) that a causal nexus existed between the harassment and protected group status; (4) that harassment affected a term, condition, or privilege of employment; and (5) that her employer

knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Hales v. Casey's Mktg. Co.*, 886 F.3d 730, 735 (8th Cir. 2018).

### 1.     *CRST's Duty to Prevent and Remedy Sexual Harassment*

In seeking summary judgment, CRST contests only the fifth element of Neel's hostile work environment claim.[2]     That element involves two questions: (1) whether CRST knew, or should have known, about the alleged harassment and (2) whether CRST's actions were negligent based on what it knew or should have known. Typically, hostile work environment claims arise from the cumulative impact "of separate acts that collectively constitute one 'unlawful employment practice.'" *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1123–25 (8th Cir. 2007) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002)).  Thus, in most cases, employers are found negligent and liable only if they failed to provide appropriate remedies once they had actual or constructive knowledge of harassment that had already occurred.  *Id.*

Of course, this is not a typical harassment case.  Here, the alleged hostile work environment arose from a single, extremely severe act of harassment based on sex: rape. How an employer responds to a reported rape is certainly important to the issue of its liability, going forward, for the creation or maintenance of a hostile work environment. An employer's failure to respond, or an inadequate response, would intensify the hostile work environment created by the rape by essentially condoning such actions.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 789 (1998).  However, no response to a rape – no matter how effectively it condemns the act or prevents future instances of sexual

---

[2] Neel meets the first element.  And while Anderson has denied raping Neel, CRST assumes that Neel's allegations are true for purposes of its motion and, thus, does not challenge the second or third element of her claim.  Doc. No. 37-1 at 6 n.1.  CRST also agrees that rape is sufficiently severe to meet the fourth element of her claim.  *Id.* at 12 n.2; *see Todd v. Ortho Biotech, Inc.*, 138 F.3d 733, 736 (8th Cir.), *reversed on other grounds*, 525 U.S. 802 (1998); *see also Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1066 (9th Cir. 2002) ("The most extreme form of offensive physical, sexual conduct—rape—clearly violates Title VII.").

harassment against the victim – changes the fact that the victim suffered the most severe form of sexual harassment imaginable. If an employer's negligence results in an employee being raped by a co-worker, it cannot escape liability just because it takes prompt remedial action after the fact. *Vance*, 570 U.S. at 446 ("[A]n employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment.").

Thus, I must evaluate CRST's actions to prevent Neel's rape from occurring rather than what CRST did to remedy it. *See Faragher*, 524 U.S. at 805–06 ("Although Title VII seeks 'to make persons whole for injuries suffered on account of unlawful employment discrimination,' its 'primary objective,' like that of any statute meant to influence primary conduct, is not to provide redress but to avoid harm." (citation omitted)); *Erickson v. Wis. Dep't of Corr.*, 469 F.3d 600, 604–006 (7th Cir. 2006) (rejecting argument that an employer's duty to address sexual harassment begins only when it has actual notice of prior acts of sexual harassment because an employer has a duty to "tak[e] reasonable steps to prevent harassment once informed of a reasonable probability that it will occur"); *Paroline v. Unisys Corp.*, 879 F.2d 100, 107 (4th Cir. 1989) ("In a hostile environment case under Title VII, we will impute liability to an employer who anticipated or reasonably should have anticipated that the plaintiff would become a victim of sexual harassment in the workplace and yet failed to take action reasonably calculated to prevent such harassment."), *opinion vacated in part on other grounds on reh'g*, 900 F.2d 27 (4th Cir. 1990); *Hush v. Cedar Fair, L.P.*, 233 F. Supp. 3d 598, 605 (N.D. Ohio 2017) ("In this case, involving as it did a single incident of sexual harassment, the 'appropriate' action was not 'remedial' or 'corrective,' but rather preventative. This does not require actual foreknowledge; instead, it calls for attentive foresight."). *But see McCurdy v. Ark. State Police*, 375 F.3d 762, 773 (8th Cir. 2004) (employer was not liable for supervisor's single incident of harassment under a negligence theory in case where supervisor touched plaintiff's breast and made sexual comments because the employer took quick and effective action to prevent future instances of

harassment). In other words, the question of CRST's negligence – and thus its liability – depends on whether its actions, based on what it knew or should have known, were reasonably calculated to prevent severe forms of sexual harassment, such as Neel's rape, from occurring in its workplace.

Neel argues that CRST was negligent in two ways. First, she argues that CRST negligently hired Anderson, certified him as a lead driver and assigned him a female driver. *Id.* at 14–17. She also argues that CRST was negligent because its policies, trainings, reporting mechanisms and remedial procedure for sexual harassment were inadequate to prevent sexual harassment and heedlessly discouraged women from reporting sexual harassment. *Id.* at 17–19. I will analyze these arguments separately.

### a. CRST's Decision to Rehire Anderson

Neel's central argument regarding CRST's choice to employ Anderson as a lead driver is that CRST failed to take appropriate precautions to prevent Anderson from raping her. Doc. No. 42 at 14–17. She argues that Anderson was an alcoholic, had a criminal history of violence towards women and was not qualified to be a lead driver. *Id.* Much of this information, Neel argues, would have been discovered had CRST performed adequate background and criminal history checks before hiring Neel as a lead driver. *Id.* at 15. Thus, because (1) the employment environment for female drivers at CRST already creates a high risk of sexual harassment or assault and (2) Anderson posed an even greater risk of sexual harassment, CRST should not have hired Anderson or certified him to be a lead driver. *Id.*

CRST's response focuses on its knowledge at the time it rehired Anderson in 2017. Doc. No. 37-1 at 15–18. It argues that it addressed the known general risks of sexual harassment for drivers by providing its employees with a sexual harassment policy and training. *Id.* at 15. It also argues that it cannot be held liable for Anderson's actions because it had no reason to suspect that he would harass or rape Neel or other female employees. *Id.* at 16–17. Anderson had worked for CRST previously, had trained a

female driver, and had never been accused of sexual harassment. *Id.* at 16. CRST counters Neel's arguments regarding Anderson's criminal history by arguing that its policy at the time – conducting a criminal history check only if an applicant disclosed a criminal conviction – was sufficient. *Id.* Even if it had checked Anderson's criminal history, CRST argues that the existence of a single prior arrest (but not conviction) for domestic assault would not have provided a basis for it to anticipate that Anderson posed a threat of rape to a fellow employee while on the job. *Id.* at 16–17.

To properly analyze this issue, it is important to first determine what CRST knew about Anderson, actually or constructively, at the time it rehired him. The issue then becomes whether that knowledge provided reasons for CRST to anticipate that Anderson was more likely to harass or assault a fellow employee such that it had a heightened duty to prevent him from doing so. *See Dewey v. Chertoff*, 416 F. Supp. 2d 661, 673 (N.D. Iowa 2006) (plaintiff failed to establish employer's liability because she failed to provide "any evidence that there was any basis for the [employer] to anticipate, i.e., from which it 'should have known,' before it happened, that such harassment was likely."); *see also* Restatement (Second) of Agency § 213 ("A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: . . . (b) in the employment of improper persons or instrumentalities in work involving risk of harm to others . . . or (d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.").

At the time it rehired him, CRST knew that it had employed Anderson twice before. Doc. No. 42-3 at 83. It also knew that Anderson failed to meet some of its hiring guidelines, though the record is unclear how this affected CRST's decision-making process. There is evidence from Toby Campanelli, Anderson's manager during his second period of employment, that Anderson was very unreliable and frequently failed to report to work. *Id.* at 85. When Campanelli asked other drivers about Anderson's behavior, he was told that Anderson had a very severe drinking problem. *Id.* at 86.

Viewing this evidence in a light most favorable to Neel – and setting aside questions about its admissibility – CRST had, at the very least, constructive notice that Anderson had been an unreliable driver who may have abused alcohol. *See Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009) (constructive notice generally exists when an employee has provided information to management level personnel). CRST also knew it was rehiring Anderson despite the fact that he did not meet some of its hiring guidelines.

While these facts certainly lead one to question why CRST decided to rehire Anderson, that is not the question here. To create a basis for negligence, Neel must show that knowledge of these facts gave CRST reason to anticipate that Anderson presented a likely threat of sexual harassment or assault to its female employees. Neel has failed to do so.

Anderson's past issues when employed by CRST did not give CRST any reason to anticipate that he posed a likely threat of sexual harassment or rape to its employees. Anderson's history of unreliability would certainly provide notice of the likelihood of future unreliability, but not a risk of sexual assault. Additionally, the fact that an employee has had struggles with alcohol outside of work does not compel the conclusion that he or she is more likely to sexually harass or assault a co-worker at work. Neel has provided no evidence showing that CRST had knowledge that Anderson had ever consumed alcohol while on the job. Campanelli's affidavit does not say that other drivers reported that Anderson was intoxicated while he was on duty. Indeed, the affidavit implies that other drivers reported Anderson's struggles with alcohol only in response to questions about why he was unreliable and often failed to show up, not about any issues with alcohol while he was actually on duty. Additionally, during his employment as a driver at CRST and elsewhere, Anderson was subject to drug and alcohol testing. Doc. No. 37-3 at 61–63. There is no evidence that Anderson ever failed a work-related alcohol or drug test.

Neel claims that Anderson drank alcohol while in the truck in the days leading up to her rape. Such allegations, combined with CRST's knowledge of Anderson's prior issues with alcohol, would likely have put CRST on notice that Neel faced a greater risk of sexual harassment or assault. However, it is undisputed that CRST did not have knowledge of these allegations before the rape because Neel did not adequately report them. Thus, while this scenario may be relevant to whether CRST's reporting practices were adequate, it does not show that CRST knew, or should have known, that Anderson was more likely to sexually assault Neel.

The record does not reveal any other basis for CRST to anticipate, based on its actual or constructive knowledge at the time, that Anderson posed a threat of sexual harassment or assault to its female drivers. During Anderson's prior terms of employment, CRST had received no complaints against him from prior co-drivers. Anderson had driven with and trained at least one female student, who raised no complaints. The lack of prior issues with Anderson indicates that CRST had no reason to anticipate that he posed a threat of sexual harassment or rape in the future. *See Sellars v. CRST Expedited, Inc.*, 385 F. Supp. 3d 803, 833 (N.D. Iowa 2019) ("[T]he law does not require an employer to anticipate the misconduct of its employees when those employees have given no indication that they would engage in misconduct.").

Neel's second argument is that CRST was negligent because it should have known that Anderson posed a threat to its female drivers because of his criminal history. She asserts that such knowledge would have prevented CRST from hiring Anderson, making him a lead driver or, at the very least, assigning him female drivers.

Before evaluating how Anderson's criminal history may have affected CRST's duty to act, it is important to determine the extent of CRST's duty to learn more about his criminal history to begin with. In Iowa, outside a few statutorily specified fields of business, employers do not have a general duty to check an applicant's criminal history. *See, e.g.*, Iowa Code Ann. § 135C.33. However, an employer may have a duty to perform a criminal history check if it is standard practice in its industry. *Cf.*

*Benninghoven v. Hawkeye Hotels, Inc.*, 902 N.W.2d 593, 2017 WL 2684351, at *2 (Iowa Ct. App. 2017) (noting that background checks are standard practice in the hospitality industry).  An employer may also have a duty to learn the criminal history of applicants if hiring someone who has a history of certain crimes would raise the probability of harm to its employees or clients based on the nature of its work environment.  *See Erickson*, 469 F.3d at 604–05 ("The greater the potential injury to the employee, the greater care the employer must take."); *see also Benninghoven*, 2017 WL 2684351, at *2 (criminal history checks have become standard practice in the hospitality industry due to employees' close interactions with hotel guests and their possessions).

CRST does not specifically address whether it had a duty to investigate its applicants' criminal histories, but it did have a policy on the matter at that time.  CRST's application materials required applicants to report if they had ever been convicted of a crime or had any criminal charges pending.  If an applicant responded in the affirmative, CRST would perform a criminal history check. Anderson's application with CRST reported that he had no criminal convictions or pending criminal actions, and there is no evidence in the record that these assertions were false.  Thus, CRST did not investigate his criminal history.

Neel has provided evidence that Anderson was arrested and charged with domestic abuse in August 2015, though the charge was dropped a few days later.  The record also shows that a woman who had not been involved in the domestic abuse incident had once obtained a restraining order against Anderson.  Neel contends that CRST should have had knowledge of these acts by performing a criminal history check, as some of Anderson's other employers in the trucking industry had done.  She argues that because these incidents showed Anderson was prone to violence towards women, CRST was negligent because it would not have allowed Anderson to train female drivers had it known of these incidents.

I disagree with Neel's arguments on two grounds.  First, whatever the extent of CRST's duty to investigate its applicants' criminal histories may be, its policy at the time

it hired Anderson met its standard of care as a matter of law. When the basis of an employer's liability for a sexual harassment claim is negligence, the employer's standard of care is that its actions must be "reasonably calculated to stop the harassment." *Engel*, 506 F.3d at 1125. While this standard is typically used to determine whether an employer was negligent in *responding* to complaints of sexual harassment, there is no reason this standard should not carry over to determining whether an employer was negligent in *preventing* an extremely severe, single incident of sexual harassment from occurring. Thus, CRST's duty was to have and carry out a background check policy that was reasonably calculated to stop the type of harm here (severe forms of sexual harassment or assault, such as rape). CRST's policy of requiring applicants to report all convictions or pending actions for crimes – and conducting a more thorough review upon learning of a criminal record – sufficiently did so. CRST was not negligent on this ground.

Second, even if there was a genuine issue as to whether CRST should have conducted a criminal history search on Anderson, I find that his criminal history would not have given CRST reason to anticipate that he was likely to rape a female co-driver. While a dismissed charge for domestic battery, along with a restraining order, may reveal that Anderson struggled in some of his personal relationships with women, they do not give rise to a reasonable prediction that he would sexually harass or rape a female co-worker. The law generally does not consider an arrest to be an appropriate basis for finding a propensity to perform a certain act again in the future. *See United States v. Woolbright*, 831 F.2d 1390, 1398 (8th Cir. 1987). Likewise, evidence of a restraining order against Anderson does not prove that he did anything criminal, nor would it give CRST reason to anticipate that Anderson posed a threat of sexual assault to female employees. In fact, there is no evidence that the restraining order would have even appeared on any criminal history report CRST could have obtained.

In short, Neel has not provided sufficient evidence to show that there is a genuine issue as to whether CRST knew, or should have known, that Anderson posed a risk of sexual assault to its female employees. Its knowledge regarding Anderson's prior periods

of employment and potential issues with alcohol did not give CRST reason to anticipate that Anderson would sexually assault a female co-driver. Further, CRST's application process at the time it hired Anderson was reasonably calculated to discover applicants who had a history of criminal acts and to address risks they may have posed to fellow employees. Even if CRST should have investigated further, there is no evidence that it would have discovered additional information raising a reasonable concern that Anderson would harass or rape a female co-worker.

### b. CRST's Sexual Harassment Policies and Trainings

Neel also argues that CRST was negligent because its policy was insufficient to prevent sexual harassment and discouraged women from reporting it. Doc. No. 42 at 17. As before, analyzing this argument involves determining (1) what CRST knew or should have known regarding the general risks of sexual harassment and assault in its workplace and (2) whether its policies and trainings were reasonably calculated to address those risks and prevent harassment. Neither party contends that CRST did not know the risks of sexual harassment that female drivers face. Instead, the parties disagree about whether CRST's actions were adequate in addressing those risks.

Neel contends that CRST's policies and training discouraged reporting sexual harassment and that female drivers ultimately had "no means for notifying CRST of harassment without increasing the risk of danger to the victim of the harassment." *Id.* She has also submitted an affidavit from Justine Tinkler, Ph.D., a professor at the University of Georgia, who evaluated CRST's sexual harassment policy and training materials. Doc. No. 42-2 at 4–5; Doc. No. 42-3 at 59–64. Dr. Tinkler opined that CRST's policies, procedures and practices were generally an ineffective means of preventing harassment and even indirectly encouraged it in some ways. Doc. No. 42-2 at 4–5; Doc. No. 42-3 at 59–64.

CRST argues that its policies and trainings were sufficiently comprehensive to satisfy its obligation to prevent and remedy sexual harassment in its workplace. Doc.

No. 37-1 at 13. It contends that its policies have been found adequate by the Eighth Circuit in prior cases and there is no reason to deviate from those findings here. *Id.* at 17. In response to the affidavit from Justine Tinkler, CRST has filed a motion to exclude it as irrelevant and unnecessary. Doc. No. 40.

Before proceeding to discuss whether CRST's policies and training constituted negligence in regard to Neel's rape, I find it important to address the issue of Dr. Tinkler's affidavit, as she is an expert who has opined on whether CRST's policies and trainings prevent sexual harassment. CRST argues that her opinion should be excluded because it is irrelevant. Doc. No. 40-2 at 5–8. Specifically, it argues that prevention of sexual harassment is relevant only to the *Ellerth-Faragher* affirmative defense in relation to an employer's vicarious liability for supervisor harassment. *Id.* CRST contends that because this case deals with direct liability for negligence, not vicarious liability, the court should exclude Dr. Tinkler's opinion. *Id.*

It is true that this case does not involve the *Ellerth-Faragher* defense. However, contrary to CRST's assertions – and as discussed previously – CRST's actions to prevent severe forms of sexual harassment, such as rape, are at issue here. Thus, Dr. Tinkler's opinion cannot be excluded solely on the basis of relevance.

Federal Rule of Evidence 702, which governs the admission of expert testimony, states a qualified expert may testify "in the form of an opinion or otherwise" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Expert testimony must be both relevant and reliable. *Weisgram v.*

*Marley Co.*, 169 F.3d 514, 517 (8th Cir. 1999), *aff'd*, 528 U.S. 440 (2000).

Here, I find that the admissibility of Dr. Tinkler's opinion is not relevant to the outcome of CRST's motion for summary judgment. Dr. Tinkler opines that CRST's policies create, or at least fail to adequately remedy, an environment that effectively tolerates sexual harassment. The opinion contains a general analysis of how CRST's policies and procedures measure up to scholarly findings and focuses on the general efficacy of CRST's efforts to eliminate sexual harassment in its workplace in light of those findings. Such an opinion would be relevant to the *Ellerth-Faragher* defense to vicarious liability, as employers must show that their efforts to prevent harassment are both reasonably designed and reasonably effective. *Stricker v. Cessford Const. Co.*, 179 F. Supp. 2d 987, 1006–07 (N.D. Iowa 2001).

As noted above, however, this case involves co-worker harassment, making the *Ellerth-Faragher* defense irrelevant. Instead, the basis for liability is negligence. Under a negligence analysis, even an employer's policies and actions that fail to prevent "harassment can still be adequate if [they are] reasonably calculated to do so." *Engel*, 506 F.3d at 1125. Typically, the question of an employer's negligence focuses on what it does *after* an act of sexual harassment occurs. Here, however, it is the extreme, single act of rape that justifies an increased focus on preventative measures as opposed to the more-typical focus on remedial actions. To avoid liability, CRST's policies and training procedures must be reasonably calculated, based on its knowledge of the work environment for female drivers, to protect female employees from severe forms of sexual harassment, such as rape. Even if I consider Dr. Tinkler's opinion to be part of the summary judgment in this case, I find that CRST's policies and trainings satisfied that burden as a matter of law.

CRST was aware that female drivers were at risk of sexual harassment, including sexual assault, due to the nature of its driver system. As discussed above, CRST had a policy that was reasonably calculated to discover specific employees who may pose a risk of sexual harassment or assault to other employees. It also had a written policy regarding

sexual harassment that it disseminated to all employees and provided some training on the matter. Materials provided to employees gave instructions about who to call when experiencing sexual harassment and promised that a driver could be assigned a new co-driver without fear of retaliation. Employees were made aware that they would be immediately removed from a harassing situation for their protection and to allow for an investigation. Most tellingly, there is no evidence that any CRST employee could have reasonably believed that CRST tolerated or permitted sexual assault or rape.

Neel has not provided sufficient evidence to show that CRST's policies and trainings were not reasonably calculated to prevent severe forms of sexual harassment. Dr. Tinkler's opinion provides little, if any, insight on the likelihood that a female CRST driver will be sexually assaulted by a male co-worker or the ways that CRST's policies and training affect that likelihood. The record, including Dr. Tinkler's opinion, does not generate a genuine issue of material fact on the issue of whether CRST's policies and training practices increased the likelihood, or at least tolerated a high likelihood, that female drivers would be raped.

For the foregoing reasons, Neel has failed as a matter of law to establish her sexual harassment claims under federal and Iowa law. This does not, of course, suggest that Anderson's alleged conduct was anything other than despicable. The question is whether CRST is liable for that alleged conduct. Under the legal standards I must apply, it is not.[3]

## B. *Retaliation*

Neel asserts retaliation claims under the ICRA and Title VII. Both statutes prohibit an employer from retaliating against an employee who has engaged in a protected activity. *See Hunt v. Nebraska Pub. Power Dist.*, 282 F.3d 1021, 1028 (8th Cir. 2002). Protected

---

[3] Because I have found that the outcome is the same with or without Dr. Tinker's opinions, I will deny CRST's motion to exclude those opinions and consider them to be part of the summary judgment record.

activities include opposing an act of unlawful discrimination or participating in an investigation into unlawful discrimination. *Id.* When a plaintiff relies on indirect evidence of retaliation in asserting his or her claim, as is the case here, the claim is analyzed under the *McDonnell Douglas* burden-shifting framework. *See Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 880 (8th Cir. 2014).

Under the *McDonnell Douglas* framework, a plaintiff must first show a prima facie case of retaliation. *Id.* at 577–78; *see also Hawkins v. Grinnell Reg'l Med. Ctr.*, 929 N.W.2d 261, 268 (Iowa 2019). The burden then shifts to the defendant, who must articulate a legitimate, non-discriminatory reason for its action. *Young*, 754 F.3d at 577–78. If the defendant does so, the burden shifts back to the plaintiff to show that the reason for the defendant's actions is a pretext for unlawful discrimination. *Id.*; *see also McCullough v. Univ. of Arkansas for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009).

To establish a prima facie case of retaliation under Title VII, a plaintiff must present evidence that (1) he or she engaged in a protected activity, (2) an adverse employment action was taken against him or her and (3) a causal connection exists between the two. *Barker v. Missouri Dep't of Corr.*, 513 F.3d 831, 834 (8th Cir. 2008); *Thompson v. Bi–State Dev. Agency*, 463 F.3d 821, 826 (8th Cir. 2006). Except with regard to the causation element, the elements of a retaliation claim under the ICRA are similar. *Compare Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 750 (Iowa 2006), *with Musolf v. J.C. Penney Co., Inc.*, 773 F.3d 916, 918 (8th Cir. 2014). The federal statute requires a higher causation standard for retaliation claims than for discriminatory discharge claims. *Haskenhoff v. Homeland Energy Sols., LLC*, 897 N.W.2d 553, 584 (Iowa 2017). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). In other words, the plaintiff must show the protected conduct was a determinative, not just motivating, factor in the employer's decision. *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008); *see also Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). By contrast, to prove

causation under the ICRA, the plaintiff must show that the protected conduct was a "motivating factor" in the employer's adverse employment decision. *Haskenhoff*, 897 N.W.2d at 635–37; *see also* Johnson, 912 N.W.2d at 855 (summarizing the multiple opinions in *Haskenhoff* and concluding that the motivating factor standard now applies to retaliation claims just as it does to discriminatory discharge claims).

CRST contests only whether Neel has met the second and third elements of the prima facie case, showing an adverse employment after the protected activity and a causal connection between the two. The adverse employment actions that Neel says she suffered are (1) employees at CRST insulted her and accused her of lying about Anderson, (2) CRST repeatedly requested that she return to work before she was ready, (3) CRST refused to authorize medical treatment she required and (4) CRST unreasonably suspended her workers' compensation benefits.[4]

To demonstrate an adverse employment action, a plaintiff must show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67 (2006). However, the Eighth Circuit has repeatedly emphasized that alleged adverse employment actions must go beyond petty slights, minor annoyances and conflict with co-workers to produce some injury or harm. *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019); *AuBuchon v. Geithner*, 743 F.3d 638, 644 (8th Cir. 2014); *Sutherland v. Missouri Dep't of Corr.*, 580 F.3d 748, 752 (8th Cir. 2009).

Neel's first two assertions do not qualify. Although her co-workers' insults and supervisors' demands to return to work may have been upsetting and annoying, they did not produce any harm or injury sufficient to rise to the level of an adverse employment action. Neel has not provided sufficient evidence to show the extent or severity of these

---

[4] Neel asserted additional adverse employment actions in her complaint but does not reassert them in her resistance to CRST's motion for summary judgment. Doc. No. 1 at 11–14. I will consider only those addressed in her resistance.

actions or how they would have dissuaded a reasonable worker from raising complaints of discrimination.

The third and fourth claimed adverse employment actions pose more difficult questions. There is little evidence regarding CRST's alleged refusal to authorize medical treatment and the workers' compensation issue appears to involve a genuine legal dispute. Nonetheless, because Neel has failed to provide sufficient evidence that these actions were causally related to her complaints of sexual harassment, I will assume that they constitute adverse employment actions.

The causation element of a retaliation claim may be established in many ways, including "evidence of discriminatory or retaliatory comments" or evidence of "a pattern of adverse action or escalating adverse actions after the protected activity." *Orluske v. Mercy Med. Ctr.-N. Iowa*, 455 F.Supp.2d 900, 922 (N.D. Iowa 2006). The timing of events, alone, may be sufficient to create an inference of retaliation, but the Eighth Circuit has typically required more than a close temporal connection to establish a retaliation claim or show that the employer's stated legitimate reason was pretext. *Wright*, 730 F.3d at 738–39. An unsupported, self-serving allegation that an employer's decision was based on retaliation cannot establish a genuine issue of material fact. *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1088 (8th Cir. 2011).

Neel has failed to provide evidence that ties CRST's alleged refusal to authorize medical care and decision to suspend her workers' compensation benefits to her complaints of sexual harassment. Neel has not shown evidence of discriminatory or retaliatory comments or acts from the decisionmakers in these actions. Indeed, she has done little more than argue that these actions are topically related to her harassment complaints, as they are part of the ongoing relationship between herself and CRST on the matter. If Neel is correct that CRST wrongfully suspended her workers' compensation benefits, the evidence she has provided shows that the suspension was due to a dispute about her eligibility, not to the fact that she engaged in a protected activity. There is nothing but speculation to support Neel's allegation that her complaints to CRST

regarding Anderson motivated CRST, in whole or in part, to suspend her workers' compensation benefits almost two years after such benefits began.

In short, Neel has failed to establish a prima facie case of retaliation under federal and Iowa law because she has not produced evidence of a causal connection between her protected activities and any adverse employment action. CRST is entitled to summary judgment on the retaliation claims.

## VI.    CONCLUSION

For the foregoing reasons:

1.      CRST's motion (Doc. No. 37) for summary judgment is **granted** as to all claims.

2.      CRST's motion (Doc. No. 40) to exclude expert witness is **denied**.

3.      Because this order disposes of all claims, this action is hereby **dismissed** and judgment **shall enter** in favor of CRST and against Neel.

4.      The trial of this case, currently scheduled to begin April 27, 2020, is hereby **canceled.**

5.      The Clerk of Court shall **close this case**.

**IT IS SO ORDERED.**

**DATED** this 3rd day of March, 2020.

_____
Leonard T. Strand, Chief Judge